## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DWAYNE S. GLOSTER**                              **CIVIL ACTION**

**VERSUS**                                                          **NO: 13-3852**

**ARCELORMITTAL LAPLACE, LLC.**          **UNITED STATES MAGISTRATE**
                                                                          **JUDGE KAREN WELLS ROBY**

### ORDER AND REASONS

Before the Court is Defendant, ArcelorMittal LaPlace, LLC's ("AML") **Motion for Summary Judgment (R. Doc. 18)**, seeking to dismiss Plaintiff, Dwayne S. Gloster's ("Gloster") claims under Title VII as there is no genuine issue of material fact as to Gloster's claims. *See* R. Doc. 18, p. 1. The motion is unopposed. It was heard on the briefs on March 26, 2014.

### I.      Background

Gloster, an African American male, alleges that he was employed with AML from November 21, 2005, until July 3, 2012, as a Steel Mill Operator, earning approximately $19.98 per hour. *See* R. Doc. 1, p. 2, ¶ VI. *See also* R. Doc. 18-3, p. 109.

On or around May 21, 2012, Gloster alleges that he had a phone conversation with the provider of his 401k, "Milliman" about receiving a hardship withdrawal from his account to prevent his home from being foreclosed upon. *See* R. Doc. 1, p. 2, ¶ V. During this conversation, Gloster alleges that he inadvertently made negative comments to the company's representative due to the time delays that occurred in him receiving the funds. *Id.*

He alleges that the 401k company contacted AML, and that he believes this led to his termination, on July 3, 2012. *Id.* In the interim, on June 4, 2012, Gloster alleges that he complied with the requests of AML, and met with a doctor to determine his "Fitness for Duty." *Id.* at ¶ VIII. However, he alleges that this doctor made no determination of his fitness for duty, and AML allegedly requested that he see another doctor. *Id.*

Shortly thereafter on June 28, 2012, Gloster alleges that an employee of AML began pressuring him to resign. However, he refused to resign and was discharged by Kristine Barney, AML's Human Resources ("HR") Manager, on July 3, 2012, for allegedly violating AML's anti-harassment policy. However, Gloster alleges that his termination was "nothing more than AML's attempt to benignly conceal its [intent] to illegally discriminate against [him]." *Id.* at ¶VI. *See* R. Doc. 18-3, p. 84 & 109.

As a result, Gloster filed a charge of discrimination[1] with the Equal Employment Opportunity Commission ("EEOC") on September 27, 2012, alleging that he was discriminated against and terminated from his employment at AML on July 3, 2012, based on his race. *See* R. Doc. 18-3, p. 109. He alleges that on March 6, 2013, the EEOC issued a Dismissal and Notice of Right to Sue Notice. *See* R. Doc. 1, p. 4.[2]

Thereafter, Gloster filed the instant civil action pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000 *et seq.*, on May 23, 2013, seeking redress for the injuries that were allegedly caused by the "deprivation of his rights and privileges" as a result of the alleged intentional discriminatory acts of his former employer, AML. *See* R. Doc. 1, p. 1, ¶ II.

---

[1] The number of the EEOC Charge is 846-2012-61422.

[2] Although Gloster alleges that he was issued a Right to Sue Notice on March 6, 2013, the Notice has not been provided to the Court.

In his complaint, Gloster alleges that he was discriminated against based on his race as an African American, as other "non-minority employees" were not terminated and / or were treated differently after being involved in incidents similar to his own. *Id.* at p. 3, at ¶ XIII. He alleges that he qualifies as a member of a protected class under 42 U.S.C. § 2000, *et seq. Id.* at ¶ IX.

He also alleges that AML's "policy" negatively and disproportionally impacted him, resulting in a disparate impact claim. *Id.* at p.3, ¶ XI. He alleges that AML's employment practices and / or policies have an adverse effect on members of the protected class as compared with non-members of the protected class. *Id.* He alleges that the policy has denied a member of a protected class a fair opportunity to work for AML, and that the policy denied "members of a protected class an equal opportunity to return to work after receiving a 'Last Chance' offer for employment." *Id.*

Gloster alleges that prior to his communication with the 401k company, he was a steady and reliable employee who had a long history of performing his duties to the satisfaction of his employer, with no performance based complaints against him. *Id.* at ¶ XII. Therefore, Gloster contends that because he is African American, he was treated differently than non-minority employees who were allowed to return to work after similar and / or comparable incidents. *Id.*

Gloster also alleges that following his termination, he made several attempts to garner "legal representation" from the United Steel Workers Union ("the Union"), but he contends that Union representatives refused to "properly speak with [him] about the incident." *Id.* at ¶ XIV. He further alleges that the Union failed to "conduct a proper investigation into the matter and adequately consider the facts surrounding [his] suspension and discharge." *Id.*

Lastly, Gloster alleges that AML committed discriminatory acts willfully, intentionally, and maliciously, as it "maliciously terminated an African American with no previous work related

problems because of an unrelated personal dispute," and it "handled [his] termination dispute in a discriminatory manner and differently than it handled disputes with employee's of other races." *Id.* at XV. As such, Gloster contends that he was harmed through the capricious and arbitrary actions of AML, and seeks damages for permanent and irreparable injury to his reputation, loss of income, emotional distress, mental anguish, humiliation and pain and suffering. *Id.* at ¶ XVII.

As to the instant motion, AML seeks summary judgment dismissing Gloster's Title VII claim on the grounds that there is undisputed evidence that his termination was not based on any race discrimination, but rather, that he was terminated for violating AML's anti-harassment policy and his Last Chance Agreement, when he engaged in offensive, harassing and abusive behavior during a phone call to AML's HR/LR manager, Kristen Barney, which included calling her a "white bitch." *See* R. Doc. 18-1, p. 2. AML also contends that it is entitled to summary judgment on Gloster's race discrimination claim because he has no direct evidence of discrimination to be able to establish a prima facie case of discrimination, and even if he could, Gloster cannot establish that AML terminated him based on pretext.

AML argues that in addition to arguing that his termination was based on race, Gloster appears to assert claims of disparate impact and disparate treatment based on acts that pre-dated his EEOC charge, which were not included in his EEOC charge. *Id.* As such, AML contends that it is entitled to summary judgment on Gloster's disparate impact and disparate treatment claims because they have not been administratively exhausted. *Id.* Lastly, AML argues that it is entitled to summary judgment on Gloster's punitive damages claim, as he has failed to provide a basis for such relief.

## II.    <u>Standard of Review</u>

Federal Rule of Civil Procedure ("Rule") 56(a) provides that summary judgment is

appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Lindquist v. City of Pasadena*, *Tex.,* 669 F.3d 225, 233 (5th Cir. Jan. 25, 2012) (quoting *Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010)). A fact is "material" if resolving that fact in favor of one party could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Poole v. City of Shreveport*, 691 F.3d 624, 626-27 (5th Cir. 2012).

However, the Court's task is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried. *Anderson,* 477 U.S. at 247–49; *Lindquist,* 2012 WL 208065, at *6 (quoting *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008)). In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party. *Id.*, 477 U.S. at 248; *Lindquist*, at *6 (*Frakes v. Crete Carrier Corp*., 579 F.3d 426, 429–30 (5th Cir. 2009); *see also Francois v. Blandford,* 10-1330, 2010 WL 569684, at *2 (E. D. La. Feb 22, 2012)).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Once the moving party carries its burden of proving that there is no material factual dispute, the burden shifts to the nonmovant to show that summary judgment should not lie. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). While the court must consider the evidence with all reasonable inferences in the light most favorable to the nonmovant, the nonmoving party must come forward with significantly

probative evidence, showing specific facts that support there is a genuine issue of material fact for trial. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000); *see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." *Id.* The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue of fact for trial." *Celotex Corp.*, 477 U.S. at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994). As such, if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *See Szabo v. Errisson*, 68 F.3d 940, 942 (5th Cir.1995); *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir. 1994).

In considering a summary judgment motion, the Court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Rule 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "A court may consider only *admissible evidence* in ruling on a summary judgment motion." *Mersch v. City of Dallas, Texas*, 207 F.3d 732, 734-35 (5th Cir. 2000) (emphasis added). Assertions presented in a statement of contested or uncontested facts "are not competent summary judgment evidence." *Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 61 & n.3 (5th Cir. 1994) (quoting *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993). The Court may consider the admissibility of summary evidence sua sponte. *Bellard v. Goutreaux*, 675 F.3d 454, 460-61 (5th Cir. 2012).

The summary judgment standard in an employment discrimination matter is premised upon a burden-shifting analysis from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and

its progeny.  Thereunder, the Court must first determine if the plaintiff has established a *prima facie* case of discrimination, sufficient to raise an inference of discrimination.  *Id.* at 802; *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002) (finding that in Title VII actions, a *prima facie* standard is used for evidentiary purposes on summary judgment); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986) ("The *McDonnell-Douglas* formula [] is applicable [] in a [] summary judgment situation.").

"Establishment of a *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citing *Burdine*). "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to different factual situations." *McDonnell*, 411 U.S. at 802 n.13. "There is no doubt that vague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment." *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998).

### III.   Analysis

#### A.   Race Discrimination Claim

AML argues that there is no genuine issue as to any material fact of Gloster's Title VII race discrimination claim, because he has no direct evidence of discrimination so as for him to establish a prima facie case of discrimination. *See* R. Doc. 18-1, p. 2. AML contends that Gloster was terminated for violating AML's anti-harassment policy and his Last Chance Agreement, when he engaged in offensive, harassing and abusive behavior during a phone call to AML's HR/LR manager, Kristen Barney, which included calling her a "white bitch." *Id*. AML argues that even if

this Court were to find that Gloster presents evidence sufficient to establish a prima facie case, it is still entitled to summary judgment because Gloster cannot establish that he was terminated based on pretext. *Id.*

Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" *See* 42 U.S.C.§ 2000e-2(a). In order to state a claim for race discrimination under Title VII, a plaintiff must allege (1) that he is a member of a protected class, (2) that he was qualified for the position, (3) that he suffered an adverse employment action, and (4) that others similarly situated were more favorably treated. *See Williams v. Recovery Sch. Dist.*, 859 F. Supp. 2d 824, 830 (E.D. La. 2012); *Durkin v. U.S. Postal Serv.*, 54 F.App'x. 794, 2002 WL 31845206, at *1 (5th Cir. 2002) (citing *LaPierre v. Benson Nissan*, 86 F.3d 444, 448 (5th Cir.1996)).

### i.    <u>Prima Facie Case</u>

Here, the parties do not contest that Gloster, as an African American, is a member of a protected class.  *See* R. Doc. 18-1, p. 19.  However, AML contends that (1) Gloster was not qualified for his position, as he had not been medically cleared for work by a physician, and (2) it did not treat others outside the protected class more favorably. *Id.* Specifically, AML contends that as a condition of the Last Chance Agreement, Gloster was required to participate in an employee assistance program to determine his fitness for duty. *Id.*

AML contends that when Gloster went to a third-party medical provider, R.D. Associates LLC., to be examined for his Fitness For Duty Evaluation ("FFDE"), the medical provider was unable to evaluate him because Gloster did not cooperate and or / participate sufficiently with the

provider, therefore the provider found that Gloster was not fit for duty. *Id. See* R. Doc. 18-3, p. 107. As a result, AML contends that Gloster cannot show that he was qualified for the position, and as such, he has failed to establish a prima facie case of discrimination.

To demonstrate "qualification for the position" for the purpose of an employee-plaintiff proving his prima facie case requires "only that the plaintiff show that [he] met the minimal, objective qualifications for the position." *Anderson v. Mississippi Baptist Med. Ctr.*, 2011 WL 3652210 (S.D. Miss. Aug. 18, 2011); *Johnson v. Coca-Cola Enterprises Inc.*, No. 05-1479, 2006 WL 2873474 (W.D. La. Oct. 6, 2006); citing *Pratt v. City of Houston*, 247 F.3d 601, 606 n. 2 (5th Cir.2001) (holding an applicant who meets the "minimal qualifications" of the position satisfies the qualification element of the prima facie case); *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir.2001) ("an employee must demonstrate that he meets objective hiring criteria at the prima facie case stage, and the issue of whether he meets subjective hiring criteria is dealt with at the later stages of the analysis").

Here, Gloster signed the Last Chance Agreement with AML on May 28, 2012, following his violation of AML's anti-harassment policy on May 21, 2012, for contacting Milliman, a vendor hired by AML to administer and provide a service to its employees on four separate occasions, using inappropriate language, threats and verbalized accusations of racism to the company representative. *See* R. Doc. 18-3, p. 65.  AML provided the Court with a digital copy of the call recordings as well as a transcript of the recording as well.

On May 14, 2012, at 2:36 p.m., Gloster contacted the Milliman benefits customer service center angrily indicating that he was hung up on earlier that day by another person. *See e.g.,* R. Doc. 21, manual attachment recording; *see also* R. Doc. 18-3, pp. 17-60. Before any of the customer

service representatives could verify Gloster's information he requested that he be transferred to a supervisor. Once he was transferred to a supervisor, he resisted verifying his account and / or address information.

After almost a minute, he informed the supervisor that he wanted "his money," i.e., that he wanted to request a hardship withdrawal from his 401k account. Upon checking his account, he argued vigorously with the supervisor about not wanting to provide a utility bill for proof of identity and/or verification purposes. He continued to make references to "smart a-s white boys" and he commented that there were too many supervisors. He also indicated that he felt he was "being put through bull– it  for his money," and angrily threatened that "white boys do this to him every time." He also indicated that he wanted "a real supervisor on because you are not a real supervisor." The call was terminated by the supervisor due to Gloster's threatening and angry tone with him.

At 2:51 p.m., Gloster immediately called back, requesting the "real male supervisor"  that "he used to talk to. . ." as  "he was tired of putting up with everyone's bull– over there" and that they "was [sic] going  to make him come over there and hurt somebody." He was eventually transferred to Kyle, a supervisor, who Gloster had spoken to in the past about his loans. He stated that "every time I apply for something there is always a problem. . . my mailing address is in the country and we don't get mail out there" so he indicated that he believed they already had an electric bill on file and that he did not believe he needed to provide another one. Kyle also indicated to Gloster that the company was audited last year, which is why they now require an updated bill for him to obtain a hardship withdrawal. Gloster refused to cooperate, and continued to make rude comments – including "stop fuc— people over on their money" – about the process on obtaining money and the "technicalities" required to obtain his money.  He also threatened the supervisor, and

stated that he "wished Bin Laden would come back and drop a bomb on ya'll" and that he was "sick and tired of ya'll trying to beat a nig– on a technicality." The Supervisor continued to explain to Gloster that he needed to submit the form with his bill, but Gloster refused to listen and stated that "I know you white, a black would not act like you . . . I wish that something bad would happen to all of you. . . Bin Laden please come back." Because of his racist remarks, the supervisor terminated the call.

Gloster contacted the benefits center again on May 21, 2012, at 12:38 p.m. He stated that because he waited a week for his "check," he believed he was being "harassed and deliberately kept from getting his money." He went on to state that he believed it was a racial issue, and that he felt that the company was getting revenge against him for being a "smart mouth black." He also stated that he and his "attorney [were] going over there and show[] you we received [the document which was faxed]- what ya'll [sic]doing there is deliberate and I know it is because of white technicality and power."

Gloster angrily stated that he believed the company was filled with "white boys" trying to "show this nig–r" and "run him off," and that everyone there is lying and using "technicality and power." In an effort to calm Gloster, the supervisor, Kyle, stated that he was trying to look for the fax, but Gloster would not stop saying "stop acting like you do not understand. . . you know what you doing . . .you going to come up with it now. . . we gonna [sic] show the n— and make him fax it again." The supervisor attempted to help Gloster and discuss the whereabouts for the lost fax, and even offered Gloster his direct fax number, so that he may resubmit his fax paperwork for his hardship withdrawal. However, Gloster stated that he wanted the supervisor to "stop lying and give me my money," and shockingly stated "when there are floods want to know why white people are

affected, because the good lord knows all the dirty sh– you do to black people . . . so when yo[sic] sh-t happen to you just remember what you do to people . . .and you no different from any other white person. . . you ain't [sic] doing anything now but lie like a white a-s person." The supervisor ended the call shortly thereafter.

Gloster called back at 1:19 p.m., and was directed to the same supervisor, Kyle. Gloster states that he and his attorney resubmitted the fax document. He also states "you can act like you did not receive it again to show someone that you have power over a ni–ger." After discussing the "technicalities" over transmitting the electric bill by fax, the supervisor went over the bill that was received, and informed Gloster that his name was not on the bill.

Before the supervisor could state anything else, Gloster began screaming at him and repeating over and over again "don't come here with no technicality and your lies from the beginning. . . you know you trying to hurt this nig—." Although the supervisor attempted to explain to him that his name had to be on the bill for him to prove that the utilities were in his name in order to establish proof of address and obtain the benefits he sought, Gloster waited some time and said to him that he "sure wishes his fu–ing child dies." Shortly thereafter, the supervisor terminated the call.

Gloster called back at 1:28 p.m., asking "where your building at dog? You want to F– over me, I am going to show you what a nig– can do you white bi–h"... accusing him of lying and "showing a nig— and threatening me and using power." Gloster went on to state that "when you fu– over a black man money, you white bit– you know you getting what you deserve" and continued to call him a "mother fu—." He indicated that when he gets back to work, he will make sure that AML "gets rid of their [sic] pu– asses" and go with another provider for its services. Before the call

was ended, Gloster again threatened the supervisor by stating "you think that screwing over a nig–will make your whore happy and nappy haired children happy . . . you'll [sic] see. . . I'll bomb you white motherfu–er."

Gloster called back at 2:18 p.m., and would not tell the representative his name. After asking him several times, he indicated that his name was "KKK . . . White Supremacist" and that he needed to be transferred to a supervisor immediately. Upon his refusal to comply, the phone call was terminated by the customer service representative.

After being disconnected, he called back at 2:28 p.m., and was transferred to the same supervisor, stating that he was "tired of the rigging [sic] and rolling and that he was ready to see if you was gonna [sic] lie again." After a line of inappropriate language and racial slurs, the supervisor informed Gloster that the bill with his name and address was received and was proper. However, Gloster managed to end the call with "all the white mother fu–s white supremacists and KKK members."

Following these phone calls, on May 28, 2012, Gloster, along with his supervisor Kristen Barney, and Kinley Porter, the President of local Union, entered into an agreement called the "Last Chance Agreement," in lieu of AML terminating Gloster for his usage of inappropriate language, racial slurs, threats and accusations of racism he made to the Milliman representatives. *See* R. Doc. 18-3, pp. 65-66. Gloster's behavior constituted a serious violation of AML's harassment and employee conduct policies,[3] which provided that such a violation could result in his termination.

---

[3]*See e.g.,* R. Doc. 18-3, at p. 62, AML's Employee Conduct Policy provides in pertinent part: "[W]hen acceptable standards of personal conduct and work performance have been seriously violated, the employee is subject to discharge. Examples of items that will not be tolerated any may cause discharge. . .willful abuse. . . and indecent or immoral conduct." *See also id.,* at p. 63, AML's Harassment Policy, which provides in pertinent part: "Any verbal or implied threat of violence, regardless if the intent is real or meant to be a joke, will be taken seriously and considered a violation of this policy. Like at the airport. . . there are no jokes when it comes to this behavior. A person in violation of this policy is subject to disciplinary action, up to and including termination of employment."

AML's Employee Conduct Policy provided that "when acceptable standards of personal conduct and work performance have been seriously violated, the employee is subject to discharge. Examples of items that will not be tolerated and may cause discharge. . .willful abuse. . . and indecent or immoral conduct." *See* R. Doc. 18-3, p. 62. AML's Harassment Policy provided that "any verbal or implied threat of violence, regardless if the intent is real or meant to be a joke, will be taken seriously and considered a violation of this policy. Like at the airport. . . there are no jokes when it comes to this behavior. A person in violation of this policy is subject to disciplinary action, up to and including termination of employment."   *Id.* at 63. However, rather than immediately terminate him for his conduct, he was allowed the opportunity to comply with the terms and conditions listed in the "Last Chance Agreement," and remain employed with AML. *Id.*

One of the terms of the agreement included Gloster agreeing to participate in an "Employee Assistance Program assessment" to determine his "Fitness for Duty." *Id.* As indicated above, Gloster was sent for an evaluation with Robert D. Davis, licensed Medical Psychologist and Neuropsychologist,  ("Dr. Davis") of RD Associates LLC. The evaluation took place on June 4, 2012. *See* R. Doc. 18-3, p. 67-71.

During the evaluation, Dr. Davis indicated that Gloster held a sensitive safety position at AML as a Second Helper, but that he was currently suspended, and referred to his offices for evaluation secondary to "interpersonal difficulties, racially offensive conduct, unprofessional conduct, and possible criminal conduct," which reportedly occurred on March 1, 2012, and May 21, 2012. *Id.* Upon examination, Dr. Davis noted that Gloster resisted the FFDE even though he was informed that his refusal to comply would result in his termination.

Because of Gloster's lack of participation, Dr. Davis found that "Gloster did not cooperate

sufficiently with the FFDE, which would allow the formulation of a reasonable conclusion regarding his current mental or emotional condition based upon his psychometric performance." *See id.,* at p. 71. Dr. Davis also found that Gloster's "minimization or lack of insight and his relatively random response set psychometrically, that may have related to any real and significant problems is inconsistent with clinical observation and his statement that he has a mental illness." *Id.*

Therefore, Dr. Davis made no determination as to whether or not Gloster represented a direct safety threat, and whether or not he could perform the essential functions of his job. *Id.* As a result, Dr. Davis determined that Gloster was not fit for duty, could not return to work, and recommended that he be referred to a neurological / internal medicine doctor for further evaluation. *Id.*

The record evidences that after Gloster's negative evaluation, AML asked Gloster whether he would agree to attend the recommended tests and assessments, and Gloster agreed to do so, as long as AML provided him with money for gas. *Id.* AML agreed, and while it was working on the accommodations for Gloster, on June 27, 2012, Gloster left a voicemail asking to resign his employment so that he could access his 401k fund. *Id.* at 107. However, on June 28, 2012, Gloster withdrew his resignation and requested that AML either return him to work or terminate him. *Id.*

During the June 28, 2012, phone conversation with Gloster, supervisor, Kristen Barney ("Barney") requested that Gloster confirm the resignation that he left by voice mail the day before. Gloster however, frantically and angrily began screaming at Barney that he was not resigning, demanded that he either be terminated or reinstated by AML so that he "and his lawyer could handle things" and he could "get his money." *See e.g.,* R. Doc. 21, Phone Conversation from June 28, 2012.

Similar to his phone conversations with Milliman representatives, Gloster began yelling and using inappropriate language with Barney, such as "I am not fuc–g resignating [sic] . . . I am calling

the fuc–g police I am bout [sic] to go to jail . . . stop fuc–g playing with me." Gloster however, refused to confirm his resignation. Furthermore, when Barney asked whether he would comply with the requirements of obtaining a favorable FFDE, he indicated that he "didn't have time for that," and told her not to send him any letter regarding these requirements. Gloster again telephoned Barney on June 29, 2012, repeating most of his rant from the June 28, 2012, phone conversation, and again demanded that he be terminated because he refused to resign. Gloster never followed up with obtaining a favorable FFDE as required by the Last Chance Agreement. Therefore, at the time of Gloster's termination, he was not medically declared "fit for duty" to be employed with AML.

Although the Fifth Circuit has held that only objective criteria may be used in determining whether a candidate is qualified for a position, the Court finds that here, Gloster has failed to satisfy this standard, as he has failed to establish that he was qualified for the position, because he never obtained a favorable medical assessment declaring that he was "fit for duty." Therefore, Gloster's failure to comply with his "Last Chance Agreement" by failing to obtain a favorable FFDE, which was mandatory for him to return to work and continue his employment with AML, establishes that he was not qualified for the position. *See e.g., Johnson v. Louisiana,* 351 F.3d 616, 622 (5th Cir. 2003). *See also Hypolite v. City of Houston, Tex.*, 493 F. App'x 597, 605 (5th Cir. 2012); *Carr v. Murphy Oil USA, Inc.*, No. 06-1794, 2007 WL 2174589 (E.D. La. July 26, 2007) *aff'd*, 269 F. App'x 378 (5th Cir. 2008) (the Court found that the documentary and testimonial evidence established that the plaintiff had difficulty with tests during the probationary period and that he achieved the 80% minimum score on only one of the five tests administered for the job in question . . . therefore the Court determined that based on the results of the written and walkthrough tests, as well as the supervisors' observations and their evaluation of his progress he did not have a grasp of the

knowledge necessary to perform the job, plaintiff was not qualified for the position and as such, failed to establish a prima facie case of discrimination); *Dumas v. Christian Health Ministries,* 181 F. App'x 433, 434 (5th Cir. 2006) (where the Fifth Circuit affirmed the district court's granting of summary judgment as the plaintiff failed to establish a prima facie case because she failed to establish that she was qualified for the position, or that she was replaced by a person outside of her protected class where the evidence presented shows that she lacked the level of experience required for her position, as she did not possess a graduate degree, and could not satisfactorily fulfill her job duties); *Carter v. ISP Technologies Inc*., 48 F. App'x 103 (5th Cir. 2002); citing *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir. 1994) (where plaintiff was terminated because she was not physically qualified for her position at the time of termination, her prima facie discrimination case fails). Because Gloster did not establish that he was qualified for his position, he has failed to establish a prima facie case, and therefore his race discrimination claim fails as a matter of law.

### B.   Failure to exhaust

AML argues that Gloster's disparate impact claim should be dismissed for his failure to properly exhaust administrative remedies and include these claims in his September 27, 2012, EEOC Charge. *See* R. Doc. 18-1, pp. 16-19. In its memorandum in support of its motion for summary judgment, AML states that Gloster's EEOC charge alleged disparate treatment, however, after looking at the charge attached in the record, Gloster does not allege any form of discrimination other than race. *See* R. Doc. 18-3, p. 109. Therefore, the Court finds that Gloster neither alleges disparate impact or disparate treatment in his EEOC charge.

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibits discrimination on the basis of race, color, religion, sex, or national origin in federal and private

employment. However, an employment discrimination plaintiff "must exhaust her administrative remedies before she may pursue claims in federal court." *Elwakin v. Target Media Partners Operating Co., Inc.,* 2012 WL 669068, at *3 (E.D. La. Feb. 29, 2012); *see Porter v. Adams,* 639 F.2d 273, 276 (5th Cir. 1981) (noting that exhaustion is "an absolute prerequisite" to suit under § 2000e(16); *Templeton v. Western Union Tel. Co.,* 607 F.2d 89, 91 (5th Cir. 1979) (per curiam); ("[C]ourts have no jurisdiction to consider Title VII claims as to which the aggrieved party has not exhausted administrative remedies.").

In order to exhaust her administrative remedies, a plaintiff must first file a timely charge with the EEOC and receive a statutory notice of the "right-to-sue" letter. *Elwakin,* 2012 WL 669068, at *3; *Asongwe v. Washington Mut. Card. Servs. & subsidiaries,* No. 3:09-CV-0668, 2009 WL 2337558 at *3 (N.D. Tex. July 29, 2009). Although the filing of an EEOC Charge is not a jurisdictional prerequisite, it is a precondition to filing suit in district court. *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).

However, a claimant's "employment discrimination suit can be dismissed where it is not based on or related to the specific claims made in the plaintiff's Charge of Discrimination." *Elwakin,* at *3; quoting *Fine v. GAF Chem. Corp.,* 995 F.2d 576, 578 (5th Cir. 1992). As such, a Title VII complaint only encompass[es] "'discrimination like or related to allegations contained in the [EEOC] charge and growing out of such allegations during the pendency of the case before the Commission.'" *Blanchet v. Chevron / Texaco Corp.,* 368 F. Supp. 2d 589, 602 (E.D. Tex. 2004); citing *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.*, 40 F.3d 698, 711 (quoting *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970).

Accordingly, the scope of the complaint is limited to " 'the discrimination stated in the

charge itself or developed in the course of a reasonable [EEOC] investigation of that charge.' "*Blanchet,* 368 F.Supp.2d at 602; citing *Nat. Ass'n of Gov't Employees*, 40 F.3d at 712 (quoting *King v. Seaboard Coast Line R.R. Co.*, 538 F.2d 581, 583 (4th Cir.1976)); *see Thomas v. Texas Dep't of Crim. Justice*, 220 F.3d 389, 395 (5th Cir.2000); *Clark*, 18 F.3d at 1279–80; *Sanchez*, 431 F.2d at 465–66. *See also Pacheco v. Mineta*, 448 F.3d 783, 788-89 (5th Cir.2006) (Title VII claim includes issues raised in the administrative charge itself and those that can reasonably be expected to grow out of the charge of discrimination.").Thus, "the failure to assert a claim of discrimination in an EEOC charge and/or its lack of development in the course of a reasonable investigation of that charge precludes the claim from later being brought in a civil suit." *Id.*

However, the Fifth Circuit recognizes an exception to this general rule. If a party asserts a new claim for discrimination that may "have occurred after the first complaint was filed" the district court may entertain the subsequent claim as long as it is a "reasonable consequence" of the initial charge, or the subsequent "discriminatory acts are part of the same grievance." *See infra, Clark*; *Ray*, 626 F.2d at 443. *See e.g., Ellzey v. Catholic Charities Archdiocese of New Orleans*, 833 F.Supp.2d 595, 601 (5th Cir. 2011); *Kebiro v. Walmart,* 193 Fed. Appx. 365, 367 (5th Cir. 2006).

"First, a Title VII cause of action may be based 'not only on the specific allegations made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.'" *Tropez v. Veneman,* No. Civ. A.03-2156, 2004 WL 1596541, at *5 (E.D. La. July, 16, 2004); (quoting *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995); *see also Clark v. Kraft Foods, Inc.*, 18 F.3d 1278, 1280 (5th Cir. 1994).

In *Tropez,* this Court cited to the Fifth Circuit's decision in *Clark v. Kraft Foods, Inc.,* for

the proposition that where a plaintiff has failed to properly exhaust her administrative remedies before filing suit, this Court lacked proper subject matter jurisdiction to hear the claim. *Tropez*, at *5; *see Clark,* 18 F.3d at 1280. In *Clark,* the plaintiff "filed an administrative charge with the EEOC alleging sexual harassment and retaliation . . . [then before the Court] the plaintiff further alleged disparate treatment on the basis of gender." *Id.*

The Fifth Circuit concluded that "the district court had jurisdiction to reach the merits of the claim because an EEOC investigation of the claim was a 'reasonable consequence' of the plaintiff's administrative charge and supporting documentation." *Id.* Further, the Fifth Circuit stated that "the Court has jurisdiction over new acts of discrimination which may have occurred after the first complaint was filed as long as the discriminatory acts are part of the same grievance." *Id. See also Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980).

In applying this principle to the facts in *Tropez*, this Court distinguished the "reasonable consequence" exception from *Clark.* In *Tropez*, the Court found that because Plaintiff did not allege or formally raise any claim of race or sexual discrimination, the agency was not given the opportunity to adjudicate these issues, thereby Plaintiff did not properly exhaust her administrative remedies with respect to the claims she first raised in this Court. *Tropez,* at *5. Accordingly, the Court dismissed these claims for failure to properly exhaust her administrative remedies. (*See also Ellzey v. Catholic Charities Archdiocese of New Orleans,* 833 F. Supp. 2d 595, 600-601 (E.D. La. Jun. 24, 2011) (The Court dismissed Plaintiff's claims for sexual harassment and or retaliatory discharge for failure to exhaust her administrative remedies as the charge Plaintiff filed with the EEOC did not allege sexual or any type of harassment or retaliatory discharge, which is what Plaintiff's entire case rested on); (*Teffera v. North Texas Tollway Authority*, 121 Fed. App'x. 18, 21

(5th Cir. 2004) (noting where plaintiff did not check the retaliation box on his EEOC charge, he did not exhaust his claim with the EEOC and therefore could not bring the claim in a civil action)).

Here, Gloster raised "disparate impact" and / or "disparate treatment" for the first time in the complaint he filed in this Court on May 23, 2013. *See e.g.,* R. Doc. 1. Gloster did not allege or state any facts in his September 27, 2012, EEOC charge that would permit the Court to construe disparate impact as a "reasonable consequence" of his race discrimination claim.  Because this court only has jurisdiction over the claims addressed in Gloster's EEOC charge, his assertion of the disparate impact claim now, when he failed to include any allegations of it in his September 27, 2012 EEOC charge is fatal to his claim. *See e.g., Jones v. Delta Towing, LLC.,* 512 F. Supp. 2d 479, 486 (E.D. La. 2007) (Zainey, J.); citing *Mills v. Wal-Mart Stores Inc.,* 2002 WL 83644 (E.D. La. 2002) (where a plaintiff's EEOC charge made reference to a hostile work environment claim, but made no mention of retaliation, and plaintiff failed to check any other box to indicate other forms of discrimination, the Court dismissed Plaintiff's retaliation claim based on failure to exhaust the procedural administrative remedies, as the EEOC instructions directed plaintiff to check all boxes of discriminatory acts that may have applied); *see also Gage v. Greer Indus., Inc.,* 2001 WL 1018793, at *2 (N.D. Tex. Aug. 16, 2001) (court found that plaintiff's claim of race discrimination could not be reasonably expected to grow out of her EEOC charge of sexual discrimination and constructive discharge as race discrimination is not "like or related" to the charges presented before the EEOC). As such, the Court finds that Gloster's disparate impact and / or disparate treatment claim has not been administratively exhausted, and must be dismissed.

### C. <u>Punitive Damages</u>

AML argues that Gloster cannot establish a viable claim for punitive damages, therefore

there is no genuine issue of material fact as to Gloster's claim, and it should be granted summary judgment as a matter of law.

The United States has held that "punitive damages are available in claims under Title VII of the Civil Rights Act of 1964 . . . as amended, 42 U.S.C.§ 2000e *et seq*." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999). "Punitive damages are limited, however, to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Id. citing* 42 U.S.C.§ 1981a(b)(1). Furthermore, for an employee to recover punitive damages against an employer, the employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Schexnayder v. Bonfiglio*, 167 F. App'x 364, 368 (5th Cir. 2006); citing *Kolstad,* 527 U.S. at 536.

Gloster's race discrimination claim fails to establish a prima facie case of discrimination on the part of AML. Furthermore, Gloster fails to establish that AML acted intentionally, with malice or reckless indifference to him. As such, Gloster's claim fails to present a genuine issue of material fact, and fails as a matter of law.

**IV.   Conclusion**

**IT IS ORDERED** that Defendant, ArcelorMittal LaPlace, LLC's ("AML") **Motion for Summary Judgment (R. Doc. 18)** is **GRANTED**.

New Orleans, Louisiana, this 31st day of March 2014

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**